IN the MATTER OF DISCIPLINARY PROCEEDINGS AGAINST
Donald J. HARMAN, Attorney at Law.

BOARD OF ATTORNEYS PROFESSIONAL RESPONSIBILITY,
Complainant-Respondent,

v.

Donald J. HARMAN, , Respondent-Appellant.

Supreme Court

*No. 99–2862–D. Submitted on briefs March 6, 2001.—Decided
June 26, 2001.*

## 2001 WI 71

(Also reported in 628 N.W.2d 351.)

ATTORNEY disciplinary proceeding. *Attorney's license suspended.*

For the respondent-appellant there was a brief by *Donald J. Harman.*

For the complainant-respondent there was a brief by *William J. Weigel*, litigation counsel.

¶ 1. PER CURIAM. Attorney Donald J. Harman appealed from the referee's findings of fact, and conclusions of law that he engaged in professional misconduct and recommendation that his license to practice law in Wisconsin be suspended for six months as discipline for that misconduct. The referee's findings and conclusions addressed eight separate counts of professional misconduct set forth in the Board of Attorneys Professional Responsibility (Board) complaint in this proceeding.[1] Three of the counts arose from Attor-

---

[1] Effective October 1, 2000, Wisconsin's attorney disciplinary process was substantially restructured. The name of the body responsible for investigating and prosecuting cases involving attorney misconduct was changed from the Board of Attorneys Professional Responsibility to the Office of Lawyer Regulation (OLR) and the Supreme Court rules applicable to the lawyer regulation system were also revised in part. Because the conduct underlying this case arose prior to October 1, 2000,

ney Harman's handling of proceeds he received on behalf of a client after settling the client's personal injury claim. The referee determined that Harman had engaged in dishonest conduct; failed to give a third party prompt written notification of his receipt of their funds and failed to promptly deliver those funds to the third party; and failed to continue to treat as trust property, the funds which were in dispute.

¶ 2.   The remaining five misconduct counts involved Attorney Harman's conflict of interest in representing a client. The referee determined that Harman had represented the client in the presence of a conflict of interest without obtaining written consent of the client on conflict; revealed information relating to representation of a client without consent; knowingly disobeyed an obligation under the rules of a tribunal; and on two separate occasions, used information obtained during the representation of a former client to that former client's disadvantage.

¶ 3.   We adopt the referee's findings of fact and conclusions of law with respect to all eight counts of misconduct as alleged in the Board's complaint. In so doing, we reject Attorney Harman's arguments, including his motion to dismiss the complaint in this disciplinary action on the ground of the referee's alleged conflict of interest and failure to recuse herself as provided in SCR 60.04(4) and (6).[2] We hold that

---

the complainant in this case will be referred to as the "Board" and all references to Supreme Court rules will be to those in effect prior to October 1, 2000.

[2] SCR 60.04(4)(d) and (6) provide in pertinent part:

(4)   Except as provided in sub. (6) for waiver, a judge shall recuse himself or herself in a proceeding when the facts and circumstances the judge knows or reasonably should know establish one of the following or when reasonable, well-informed persons

Attorney Harman has waived any objection to the referee's participation in this matter; accordingly, we now deny his motion to dismiss the underlying complaint in this disciplinary matter which has been held in abeyance pending this court's consideration of this appeal.[3]

knowledgeable about judicial ethics standards and the justice system and aware of the facts and circumstances the judge knows or reasonably should know would reasonably question the judge's ability to be impartial:

    (d)   The judge knows that he or she, individually or as a fiduciary. . .has an economic interest in the subject matter in controversy or in a party to the proceeding or has any other more than *de minimis* interest that could be substantially affected by the proceeding.

    (6)   A judge required to recuse himself or herself under sub. (4) may disclose on the record the basis of the judge's recusal and may ask the parties and their lawyers to consider, out of the presence of the judge, whether to waive recusal. . . .

[3] Harman's motion to dismiss was based on the allegation that Attorney Janet Jenkins, who was appointed to serve as referee in this disciplinary matter, had a conflict of interest because:

    (1)   Harman, a former member of the predecessor firm to Referee Jenkins' current law firm, retained 500 shares of stock in that former firm, and therefore, he and Referee Jenkins have a "shared pecuniary interest" as shareholders in the same law firm; and

    (2)   Both St. Paul Fire & Marine Insurance Company and its subsidiary, Economy Fire & Casualty Company (St. Paul) the alleged "victims" of Harman's misconduct in counts one through three, are current clients of Referee Jenkins' law firm.

    We conclude that Harman has waived any objection he might have to Referee Jenkins' handling of this disciplinary matter. Despite an opportunity to do so in an earlier disciplinary matter in which Attorney Jenkins also served as referee, Harman did not object to her handling that matter nor ask for substitution of referee. Furthermore, he did not raise any objection to Referee Jenkins in the instant disciplinary matter until

We determine that the license suspension as recommended by the referee is the appropriate disciplinary response to Attorney Harman's numerous acts of professional misconduct. This is the fourth time Attorney Harman has been disciplined for professional misconduct. We agree with the referee's observation that Attorney Harman's pattern of conduct demonstrates a disregard of the legal system and his willingness to ignore established procedures for dispute resolution in favor of his perceived personal expediency. The seriousness of Attorney Harman's professional misconduct warrants the suspension of his license to practice law in this state for six months.

¶ 4. Attorney Donald J. Harman was admitted to practice law in Wisconsin in 1960 and currently practices in La Crosse. He has been disciplined for professional misconduct on three previous occasions.

¶ 5. In 1998 Attorney Harman was publicly reprimanded for his failure to act diligently and promptly in representing his client, his demonstrated lack of understanding of his professional duties, and his unwillingness to take responsibility for his misconduct. *Disciplinary Proceedings Against Harman*, 221 Wis. 2d 238, 584 N.W.2d 537 (1998).

¶ 6. In 1989 Attorney Harman consented to a public reprimand from the Board of Attorneys Professional Responsibility for having acted in the presence of a conflict of interest, for failing to maintain complete trust account records and render proper accounting of

---

after he filed his appeal in this court from the referee's report and recommendation. Because Attorney Harman never objected to Referee Jenkins' participation until after this matter was before this court, he has waived his right to raise her alleged conflict of interest based on facts he has known about for years.

funds held in trust, and failing to cooperate in the Board's investigation.

¶ 7.   In 1987 Attorney Harman was publicly reprimanded for having charged one client an excessive fee and for failing to turn over another client's files upon termination of representation despite a court order to do so. *Disciplinary Proceedings Against Harman*, 137 Wis. 2d 148, 403 N.W.2d 459 (1987).

¶ 8.   The Board filed the instant disciplinary complaint against Harman on November 5, 1999. Attorney Janet Jenkins of La Crosse was appointed to act as a referee in this matter as she had also been appointed in the prior disciplinary matter against Harman in 1998. In Attorney Harman's answer to this complaint, he admitted many of the factual allegations contained in the complaint but denied the conclusions to be drawn from those allegations. On this appeal, Harman does not explicitly claim that any of the 29 specific findings of fact made by the referee are clearly erroneous; rather, he again disputes the conclusions and recommended discipline.

¶ 9.   The Board's allegations of misconduct and the referee's findings deal with two separate matters: the St. Paul check, and Harman's representation of S.W.

## THE ST. PAUL CHECK

¶ 10.   Attorney Harman was retained to represent D.O. on a personal injury claim stemming from a 1995 automobile accident. D.O. had medical insurance through St. Paul Fire & Marine Insurance Company and its subsidiary, Economy Fire & Casualty Company (collectively, St. Paul). After making payments to D.O.'s health care provider, St. Paul asserted a subrogation claim totaling $3671.10. St. Paul

informed Harman of its subrogation claim in three letters which Harman acknowledged receiving. Subsequently D.O.'s personal injury action was settled for $69,000. Metropolitan Insurance, as insurer of the other driver and vehicle, mailed Attorney Harman a check in that amount dated August 18, 1997. That check was made payable to D.O., Attorney Harman, the chiropractor who had treated D.O., and St. Paul Insurance.

¶ 11. Attorney Harman endorsed the $69,000 settlement check on August 22, 1997, and deposited the proceeds in his trust account. Harman's endorsement on the check stated "St. Paul Insurance by Donald Harman, Attorney." Harman, however, had no authorization from St. Paul to endorse that settlement check on its behalf. In his appellate brief, Harman acknowledges that his endorsement was "unauthorized" and made "without. . .authority."

¶ 12. After depositing the funds into his trust account, Harman made several disbursements including to his client, the chiropractor, and to himself for a portion of his fees. Then on September 15, 1997, Harman sent St. Paul a check in the amount of $750 drawn on his trust account. Harman's accompanying letter stated that the check was "in compromise satisfaction of [St. Paul's] lien." At that time Harman's trust account contained sufficient funds from the settlement to have paid the full amount of St. Paul's subrogation claim.

¶ 13. In his September 15th letter to St. Paul, Attorney Harman also stated that if he did not hear from St. Paul within ten days, he would assume that the company agreed that the payment was in "full satisfaction" of its subrogation claim. St. Paul did not respond within the ten-day period Harman had unilat-

erally set. Then on October 2, 1997, Harman issued a check to D.O. in the amount of $2921.10 representing the difference between the full amount of St. Paul's subrogation claim and the $750 check Harman had previously tendered to the company.

¶ 14. There had been no mutual negotiations or verified settlement agreement between Harman and St. Paul regarding the subrogation claim. In fact, the $750 check with Harman's accompanying letter was the only written notification Harman had provided to St. Paul up to that point regarding his receipt of the settlement monies and the disbursement of the proceeds.

¶ 15. Based on those facts, the referee concluded that the Board had established by clear and satisfactory evidence Attorney Harman's misconduct on the following counts:

> Count 1: By endorsing the [D.O.] settlement check on behalf of St. Paul Insurance, without authorization from that company to endorse checks on its behalf, [Harman] engaged in conduct involving dishonesty, fraud, deceit or misrepresentation in violation of SCR 20:8.4(c).[4]

> Count 2: By failing, upon receipt of the settlement check from Metropolitan, to notify St. Paul Insurance in writing that he was holding funds for it in trust; and instead, after waiting approximately 30 days, by sending St. Paul a check in the amount of $750, which was not the product of any negotiated reduction of St. Paul's claim, [Harman] failed to

---

[4] SCR 20:8.4(c) provides:

It is professional misconduct for a lawyer to:
(c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation.

give prompt notification to a third person of [Harman's] receipt of funds in which the third person has an interest, and also failed to promptly deliver to a third person funds that the third person was entitled to receive, in violation of SCR 20:1.15(b).[5]

Count 3: By holding funds in trust, portions of which may have belonged to himself, [D.O.] and St. Paul Insurance, and without having resolved any dispute as to the amount St. Paul was entitled to receive, by issuing a check to St. Paul on September 15, 1997, in the amount of $750, [Harman] failed to treat funds as trust property until there was an agreed severance of interest, and [Harman] failed to continue to treat as trust property the portion in dispute, in violation of SCR 20:1.15(d).[6]

¶ 16. We reject Harman's argument on this appeal that by accepting the $750 check and not objecting within the ten-day deadline he had set, St. Paul had "ratified" what would have otherwise been Harman's unauthorized signature when he endorsed the settlement check in the name of St. Paul. Harman's reliance on a provision in the Uniform Commercial Code, Wis. Stat. § 403.403(1) to support that ratifica-

[5] SCR 20:1.15(b) provides:

(b)   Upon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or third person in writing. . .

[6] SCR 20:1.15(d) provides:

(d)   When, in the representation, a lawyer is in possession of property in which both the lawyer and another person claim interests, the property shall be treated by the lawyer as trust property until there is an accounting and severance of their interests. If a dispute arises concerning their respective interests, the portion in dispute shall continue to be treated as trust property until the dispute is resolved.

tion argument is misplaced. Moreover, contrary to Harman's claim, Referee Jenkins did in fact address his ratification argument and found it not only irrelevant but without merit. We agree.

¶ 17. The undisputed evidence established that Harman wrongfully endorsed the check on behalf of St. Paul without any authorization or prior agreement from St. Paul to do so; in addition he failed to provide St. Paul with prompt written notice of his receipt of funds and then unilaterally disbursed a reduced amount in purported settlement of St. Paul's subrogation claim without St. Paul having agreed to accept a reduced amount. St. Paul's retention of $750 as part payment of its subrogation claim cannot be viewed as a ratification or agreement by St. Paul to accept a reduced amount for its subrogation claim.

¶ 18. We also reject, as irrelevant and without merit, Harman's appellate claim that he had, in fact, called St. Paul's toll free 800 number three times to notify the insurer that he had received the settlement check and therefore the referee should have concluded that the Board had failed to meet its burden with respect to count two. We find this argument—like Harman's ratification argument—to be wholly unpersuasive. Supreme Court Rule 20:1.15(b) mandates prompt written notification to a third person of receipt of funds to which the third person is entitled. Harman's claim that he made telephone calls to St. Paul to report the receipt of the settlement check is not compliance with the rule. Alleged oral notification of receipt of funds does not satisfy the rule. In the instant case, the first written notification Harman provided to St. Paul indicating that he had received the settlement funds was his September 15th letter accompanying the $750 check. This was mailed 24 days after he had endorsed

and deposited the settlement check. Neither the alleged telephone calls nor this letter complied with the rule's requirement for prompt written notification.

## S.W. REPRESENTATION

¶ 19. In February or March 1998 S.W. met with Attorney Harman concerning a child custody dispute she was having with her former husband. S.W. also consulted Harman about a potential legal malpractice action against an attorney who had represented her in a medical malpractice action in Wood County in 1993. In connection with that potential legal malpractice claim, Attorney Harman obtained S.W.'s case files, which included her medical records, from her former attorney. Those medical records had previously been part of the court file in the Wood County action but had been disposed of by the Wood County clerk in 1995 after that action was dismissed.[7]

[7] In his brief on appeal in this court, Attorney Harman contends that he never "undertook" the representation of S.W. in her potential legal malpractice claim because she could never point to anything that her former attorney had done that would support a claim of legal malpractice against him. Harman's argument on appeal is similar to his claim before the referee that the Board had falsely asserted that he had represented S.W. in February or March 1998. The referee rejected that argument pointing out that Harman had admitted this factual allegation in his answer to the Board's complaint; moreover, Harman had acknowledged that he had discussed the custody situation with S.W. during that time period. The referee reasoned that such discussion/consultation clearly constituted representation. In addition, the Board has attached to its responsive brief in this court, a letter written by Attorney Harman dated March 18, 1998, to the defense attorneys in the Wood County medical malpractice action in which Harman asserted that he was "representing" S.W. Based on these facts,

¶ 20.   At the time S.W. consulted with Attorney Harman, she was living with one E.J. On March 22, 1998, a domestic dispute occurred between E.J. and S.W. which resulted in criminal charges being filed against E.J. E.J. then retained Attorney Harman to represent him on those criminal charges. Attorney Harman appeared on behalf of E.J. at a hearing on March 30, 1998, and in the course of that proceeding, cross-examined S.W. concerning the domestic dispute incident.

¶ 21.   In April of 1998 Attorney Harman wrote to the La Crosse County assistant district attorney who was prosecuting the matter against E.J. In that letter, Attorney Harman referred to materials contained in S.W.'s case file in her Wood County medical malpractice claim including her medical records. In that letter, Attorney Harman wrote:

> The records I have (which were part of the public record in Wood County) show [S.W.] to have drug and alcohol dependence and a history of self-abusive behavior. I will bring these records with me when we visit about this file.

¶ 22.   Attorney Harman then forwarded some of S.W.'s medical records to the La Crosse County prosecutor. S.W. had not authorized him to disclose any of those records.

¶ 23.   Subsequently on August 31, 1998, Attorney Harman, on S.W.'s behalf, filed a motion seeking a change of physical placement of S.W.'s children. That motion was accompanied by S.W.'s affidavit that Attorney Harman had drafted for her signature. At the time

---

we agree with the referee's analysis and conclusion that Harman undertook the representation of S.W.

449

that motion and affidavit were filed, S.W. and E.J. were still living together.

¶ 24. On September 9, 1998, S.W. and E.J. had another domestic altercation in their home, which resulted in criminal charges being filed against both of them. Attorney Harman again represented E.J. S.W. was represented by an assistant state public defender. Under the terms of their respective bonds, S.W. and E.J. were prohibited from having contact with each other.

¶ 25. Despite his knowledge that S.W. and E.J. were subject to the court ordered no contact provision in their bail bonds, Attorney Harman arranged for the two of them to meet in his office on September 23 or 24, 1998, in order to resolve various issues between them. Attorney Harman prepared a statement which both S.W. and E.J. signed; in that statement they agreed that they would not consider that meeting to be a violation of the "no contact" provision of their respective bail bonds in their pending disorderly conduct cases.

¶ 26. On October 13, 1998, S.W. filed a petition seeking a temporary injunction and restraining order against E.J. At the subsequent October 16, 1998, hearing on that petition, Attorney Harman again appeared on behalf of E.J. In the course of that hearing, Attorney Harman cross-examined S.W. At the same time, Attorney Harman filed an affidavit asserting that S.W. had a "medical history of self-abusive, self-destructive behavior and Tylenol Codeine abuse. . . ."

¶ 27. The La Crosse County district attorney subsequently filed a motion in E.J.'s criminal case seeking an order to recuse Attorney Harman from representing E.J. on the ground of conflict of interest. That motion was accompanied by an affidavit from S.W. in which she averred that Attorney Harman had

requested her cooperation in his criminal defense of E.J. and that Attorney Harman had threatened that if she did not cooperate, she would lose her children and be referred to authorities for possible criminal prosecution on unrelated charges. S.W. further stated in her affidavit that as a result of these threats, she wrote letters to the La Crosse County district attorney accepting full responsibility for the couple's September 9, 1998, altercation which had resulted in disorderly conduct charges being filed against S.W. and E.J.

¶ 28. The day after the district attorney filed the recusal motion, Attorney Harman withdrew as E.J.'s defense counsel. Harman then notified the guardian ad litem in the child custody matter that S.W. had discharged Harman as her counsel; Attorney Harman, however, did not notify the court in which the custody dispute was pending that he was no longer S.W.'s counsel in the custody matter.

¶ 29. A few weeks later, Attorney Harman sent copies of S.W.'s medical records to the district attorney's office, the clerk of court, the public defender's office, the guardian ad litem, and a women's shelter. Harman acknowledged that he released S.W.'s medical records for the specific purpose of undermining her credibility and to keep ". . .[S.W.] from continuing to make false claims against [E.J.]." In releasing these records, Attorney Harman referred to S.W. as being "a liar of world class magnitude" and asserted that she had committed perjury and that she had been a drug and alcohol addict since age nine. S.W. never authorized release of these medical records by Attorney Harman.

¶ 30. Based on those facts, Referee Jenkins concluded that the Board had established by clear and

satisfactory evidence the following additional five counts of misconduct by Attorney Harman:

Count 4: By representing [E.J.] in a criminal case stemming from the March 22, 1998, incident during the timeframe he was representing [S.W.], [Harman] represented a client when representation of that client may be materially limited by the lawyer's responsibilities to another client, without obtaining written consent from his client, in violation of SCR 20:1.7(b).[8]

Count 5: By his April 1, 1998, disclosure of the content of [S.W.'s] medical records to a prosecutor, [Harman] revealed information relating to representation of a client. . .without her consent, in violation of SCR 20:1.6(a).[9]

Count 6: While knowing that the terms of their respective bonds prohibited contact with the other [Harman] facilitated a meeting between [S.W.] and [E.J.] in [Harman's] office such that [Harman]

[8] SCR 20:1.7(b) provides:

(b)   A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless:
(1)   the lawyer reasonably believes the representation will not be adversely affected; and
(2)   the client consents in writing after consultation. When representation of multiple clients in a single matter is undertaken, the consultation shall include explanation of the implications of the common representation and the advantages and risks involved.

[9] SCR 20:1.6(a) provides:

(a)   A lawyer shall not reveal information relating to representation of a client unless the client consents after consultation, except for disclosures that are impliedly authorized in order to carry out the representation. . .

knowingly disobeyed an obligation under the rules of a tribunal, in violation of SCR 20:3.4(c).[10]

Count 7: In his October 16, 1998, cross-examination of [S.W.] at the hearing on a petition for a temporary injunction and restraining order against [E.J.], [Harman] used information obtained from [S.W.] during his prior representation of her, to her disadvantage, in violation of SCR 20:1.9(b).[11]

Count 8: By his December 1998 distributions of [S.W.'s] medical records, [Harman] used information obtained from a former client during his prior representation of her, to her disadvantage, in violation of SCR 20:1.9(b).

¶ 31.   On appeal, Attorney Harman contends that the referee erred in refusing to allow into evidence two documents he claims would have established that S.W.'s medical records that he released were, in fact, public records and therefore S.W. could not claim any privilege with respect to their release. Harman maintains that S.W.'s medical records became public records when filed as part of S.W.'s Wood County medical malpractice action; thus, because the records were not privileged, Harman asserts he could disclose them

---

[10] SCR 20:3.4(c) provides:

A lawyer shall not:
(c)   knowingly disobey an obligation under the rules of a tribunal. . . .

[11] SCR 20:1.9(b) provides:

A lawyer who has formerly represented a client in a matter shall not:
(b)   use information relating to the representation to the disadvantage of the former client except as Rule 1.6 would permit with respect to a client or when the information has become generally known.

to others. Furthermore, according to Harman, the referee should have received into this record, the two exhibits he proffered reflecting the docket entries in the Wood County medical malpractice action which Harman asserts would have established that S.W.'s medical records had previously been made public in that action.

¶ 32. We reject this argument because, as the Board correctly argues in its response, it is irrelevant whether S.W.'s medical records were confidential medical records. Supreme Court Rule 20.1.6(a), the disciplinary rule Attorney Harman was charged with violating in Count 5, prohibits revealing or using information relating to a former representation of a client. Moreover, the comment to that rule notes that it is a "fundamental principle" in the client-lawyer relationship that the lawyer maintain confidentiality of "information relating to the representation." The comment explains that the rule of client-lawyer confidentiality applies not only to matters communicated in confidence by the client, ". . .but also to all information relating to the representation whatever its source." S.W. did not authorize Attorney Harman to release her medical records to anyone. His disclosure of information that he obtained while representing S.W. violated client-lawyer confidentiality.

¶ 33. We agree with Referee Jenkins' interpretation of this rule and her conclusion that the information obtained by Attorney Harman from his client, S.W., even if not protected or deemed confidential because it had previously been filed in the Wood County case, could not be disclosed without S.W.'s permission because that information was obtained as a result of the lawyer-client relationship he had with S.W.

¶ 34.  Attorney Harman does not dispute that he revealed and used information to S.W.'s disadvantage that he had obtained during the course of his representation of her. Regardless of whether S.W.'s medical records lost their "confidentiality" because they had been made part of the Wood County medical malpractice action, the fact remains that Attorney Harman obtained those records while he was representing S.W. and he then disseminated those records without her consent.

¶ 35.  The referee's conclusion that Attorney Harman's actions violated several provisions of the Rules of Professional Conduct for Attorneys, found in chapter 20 of SCR, was based on findings of fact that are not clearly erroneous. The referee's findings of fact and conclusions of law regarding Attorney Harman's professional misconduct established in this proceeding are proper, and we adopt them.

¶ 36.  The referee recommended a six-month license suspension as discipline for Attorney Harman's misconduct. We agree that under the totality of the circumstances, a six-month suspension is appropriate discipline for Attorney Harman's misconduct. That six-month suspension will require Attorney Harman to petition this court for reinstatement under SCR 22.28(3).

¶ 37.  It Is Ordered that the license of Donald J. Harman to practice law in Wisconsin is suspended for six months commencing August 1, 2001, as discipline for his professional misconduct.

¶ 38.  It Is Further Ordered that within 60 days of the date of this order, Donald J. Harman pay to the Office of Lawyer Regulation the costs of this proceeding. If the costs are not paid within the time specified and absent a showing to this court of his inability to

pay the costs within that time, the license of Donald J. Harman to practice in Wisconsin shall remain suspended until further order of the court.

¶ 39. IT IS FURTHER ORDERED that Donald J. Harman comply with the provisions of SCR 22.26 concerning the duties of a person whose license to practice law in Wisconsin has been suspended.